9-0-0-7-6 Doorknobs Heating & Air Conditioning v. James Schenker, M.D. Step up. Identify yourselves for the record, please. Good morning. Richard Nogle, N-O-G-A-L, on behalf of the appellants with me in court is Sarah Spittler and one of the named defendants, Kathleen Schlenker. Good morning. James Richard, R-I-C-H-E-R-T, for Doorknobs Heating & Air Conditioning, Plaintiff, Counter-Defendant, Appellee. Thank you. Please proceed. We'd like to reserve three minutes for rebuttal. Good morning and may it please the Court. There are two principal issues on appeal in this matter and the first is whether the trial court erred when it found that Dornbos met its burden of proof on its mechanics claim. When the work furnished by Dornbos was not completed within three years of commencement, Dornbos did not substantially complete its contract and Dornbos' claim for extras was not substantiated nor were the calculations of amounts owed explained at trial. The second main issue on appeal is whether Dornbos was responsible for design and installation errors where the Dornbos contract expressly provided and ambiguously provided that it would design the complete system and the contract provided that the workmanship would be completed within industry standards or exceed industry standards. The trial court improperly relied upon extraneous parole testimony that really had nothing to do with the contract. It occurred after the contract was executed. The architect's interpretation of the contract and certain acts of the architect and even memos written by Schlenker some two or three years after the contract in finding that somehow Dornbos did not yet have design responsibility for the building. I'll go over some of the major facts of the case. Counsel, who better than those two individuals to indicate whether or not Dornbos was in compliance? The architect and Schlenker, the owner. The issue though, the trial court just didn't even look at whether Dornbos was in compliance. The trial court found that Dornbos did not have any design responsibility and basically exonerated Dornbos from his contractual design responsibility. Let me interject when you say in compliance. In compliance with what? With industry standards, with codes, in designing the building pursuant to IDPH and other guidelines. And certainly the trial court didn't even look at whether Dornbos committed any installation errors. And who in your, it's your client's contention that which party was to have gauged or assessed that compliance with those standards either with the code or with general industry standards? Well, since Dornbos was the design build contractor, the responsibility for design and build rested with Dornbos. So it had self-responsibility for compliance. And the architect testified that it really didn't have inspection responsibility. It didn't contract with the owner to have inspection responsibility for the building. So it was the contractor's duty to comply with standards and basically the IDPH that had numerous inspections of the building and found life safety and all kinds of other violations. So basically it was IDPH in this instance since this was a surges center and there were certain very strict rules for air exchanges and such for the surges center. So the IDPH was the ultimate arbiter of compliance. So you're saying IDPH was responsible for determining whether or not Dornbos' work was in compliance and up to standard? And not the owner and not the architect on the job. IDPH was the ultimate inspector so it had to decide if the building complied with these standards. And Dornbos had the ultimate responsibility for the design and build so it had responsibility for making sure these standards were met. So Dornbos says that it met the standards if it's self-judging according to you. But IDPH and various experts disagreed as did the architect. The architect said there were problems with the design and some of the installations. So it's Dornbos just because Dornbos agreed or alleged that it didn't, first of all Dornbos admitted it created certain design and installation errors and as a matter of fact charged the owner $100,000 to fix its own mistakes. So Dornbos certainly didn't concede or agree that it was perfect. It just basically said that it could keep making these repairs until it met code somehow. Dornbos began work on the project in April of 1999. That's undisputed. The final contract with Dornbos was executed on May 15, 2000. Dornbos stipulated that this was the contracted issue in the case. And this contract specifies what mechanical equipment would be used at the project and this mechanical equipment initially specified had to be swapped out several times, that Dornbos would design and furnish the control systems for the project, that the workmanship would meet or exceed industry standards and that Dornbos would design and install the entire system for the HVAC mechanical system. The contract price was not inconsequential, $493,000 and as a matter of fact the total amount was paid to Dornbos plus another $50,000. So over $540,000 was paid by the owners to Dornbos and Dornbos claims $50,000 or so on top of that for additional extras. There were numerous serious problems with the HVAC system that did not meet IDPH code. The ceiling in the operating room was insufficiently high because Dornbos improperly designed and installed the ductwork in that ceiling. Can I interrupt you just one second? Did the Illinois Department of Public Health say that the errors that they found were not unusual errors that were made by Dornbos? Quite to the contrary. There's all kinds of, the records are replete with... I mean, but the testimony of the experts from the Illinois Department of Public Health. He said that it's not uncommon to find errors, but these errors were egregious. There's exhibits at trial... Did he say egregious errors? They said there's a record, there's one of the trial exhibits said that the building didn't meet life safety codes. There's evidence in the record that these contractors didn't know what they were doing and they were basically home contractors trying to muddle their way through. So there were all kinds of exhibits and records from IDPH very critical of the Dornbos design and installation, as was Mr. Manley who testified at trial from the IDPH. So there's the ceiling in this operating room was too low, so the ceiling had to be totally replaced. All the electrical wiring had to be reworked. The fire dampers, Dornbos testified even though his contractor required him to install those fire dampers, that he didn't know where they would go. He installed them upside down. They had to be all removed and the air handling units were improperly sized and located on the roof and there were insufficient air flows in the operating and other rooms. Dornbos charged $100,000 for this extra work and a lot of this extra work was to correct its own errors. And your client paid it? Paid some of it. I had a couple of other questions. Maybe I'm not recalling this correctly because we have four on our agenda today, but I thought that Mr. Kourilas said he was the one who told him where to put the dampers and there was an error with something going under a stair well and Mr. Kourilas had corrected that or told him to correct that. But from what I recall, Mr. Kourilas basically said the buck stopped with him and he was the one who directed Dornbos as to where to put things. He put his seal on the plans that went to the Illinois Department of Public Health and that there was a person that was your client's general contractor, I think it's Mr. Changon or something like that, who was basically directing the project. There was an owner representative, Mr. Changon, Mr. Dornbos testified that Changon told him where to put the dampers. The contract, but the contract is the contract. Dornbos agreed to install the dampers in the contract. I think the problem is we're getting away from what Dornbos' contractual responsibilities were. Kourilas might have been... Okay, then speaking to that issue, don't you think there's a conflict in the contract? The contract says that he's supposed to do the design and build, but it also says he's not, or he could charge more for bringing things up to code. He's not responsible for the issues regarding the code. Well, the contract said that Dornbos would charge additional work, additional charges, in addition to those specified in the contract. So certainly, if there was work above and beyond the contract, but he was responsible for what he set forth in the contract. I can't remember what the language is. Maybe you can tell me, but I thought the language was more like, this is our contract price. I'm supposed to design and build, but I'm not basically responsible for keeping this up to Illinois Department of Public Health code. I know that's not the... The contract says any additional work to meet code requirements, changes in building use, or unforeseen obstacles will be extra, but that would certainly be work in addition to what's specified in the contract. He agreed to do all of this per code, but any additional work would be charged extra. So that was the issue, I believe. Now, the trial court didn't find any ambiguities in the contract, and normally if you're looking at ambiguities in the contract, you look to intent of the parties and negotiations, not after the fact testimony of third parties or after the fact memos from Dr. Schlenker. There's no, the only sealed drawing in the trial court record is Exhibit 46, and that is dated, that's as-built drawings dated January 18, 2002, where the architect seals the drawings, and he says, for architectural and structural only. Now the, Dornbroth's own expert says he's never seen that before, that it's highly unusual, and that Corellis specifically didn't assume ownership for the mechanicals, and the mechanicals are what's at issue here. So Corellis only sealed the drawings, as-built for architectural and structural, and specifically admitted mechanical. Now there's no sealed, there's no evidence in the record of any sealed drawings that were submitted to IDPH. Corellis said he might have sealed them, but there's certainly the only sealed document in the entire trial court record is Exhibit 46, which is after the fact, 2002, when almost all of the work was completed, and how they could have a bearing, the architect sealing that, how they could have a bearing on a contract issued two years prior, is unsupported in fact or law. That they should have no bearing on the intent of the parties in May of 2000 in executing the Dornbroth's contract. Is that unusual in your estimation for there not to have been architecturally sealed plans and specs during the work that was ongoing on the project? Yes, IDPH testified it was unusual. They had no record of any sealed drawings. We certainly subpoenaed all of IDPH's records, and they had no records within their file of any sealed drawings either from the architect. And whose responsibility would it have been in the first instance to have submitted those plans and specs? Well in this case it would have been Dornbroth's as the design builder of the HVAC system. Now Dornbroth does have certain drawings that were submitted, and they're in the record of the system. And so Dornbroth certainly admitted that it did some work in designing and specifying the system and specified all of the equipment. Dornbroth... And why should we, I apologize for interrupting, but why should we not concern ourselves with any discussions that would have been ongoing between either the architect or the owner and Dornbroth? I think under Illinois law as far as interpreting a contract, if a contract is ambiguous, you look to the intent of the parties prior to the negotiations. Now first of all, the trial court did not find any ambiguity in the contract. The important part of contractual construction is what was the intent of the parties at the time the contract was executed in May of 2000. So what may have been the intent two years later, what the facts were, I think is irrelevant under Illinois law and contractual construction to determine what the intent of the parties was at the time the contract was executed. And that's what the trial court relies on. So the trial court relies on events that happened up to two years after the contract was executed in absolving Dornbroth of design responsibilities because of one statement that Corrales made that the buck stops here and he sealed drawings. And the only evidence in the record of the sealed drawings is this Exhibit 46 where the architect washes his hands of the mechanical drawings. Counsel, you need to wrap up. You only have, you need to reserve some time for rebuttal. Certainly. So we believe that the trial court erred in finding that Dornbroth met his burden of proof on the mechanics thing. The trial court didn't even address the fact that the work wasn't completed in three years. And Section 6 of the mechanics thing certainly requires that to have lien rights that the work must be completed within three years. And there was no evidence of owner-approved extras. Also, there was no calculations. If you look at Exhibit 21, which is the basis of the alleged calculations of the extras, it's totally unsupported. The trial court's award of the lien amount is totally unsupported in the record. And briefly, as far as the errors on the counterclaim, the trial court certainly erred in finding that Dornbroth had no design responsibility and totally ignored any installation responsibility that Dornbroth had. This work continued for a year after Dornbroth walked off the job, even though he signed the certification to IDPH in July of 2002. He walked off the job. He signed the engineer's certification that this building met all of the IDPH codes, and he admitted that was false and untrue. He walks off the job that day, and it takes a year thereafter to complete this building and obtain IDPH approval. And just briefly, we also believe the trial court erred in firing any evidence of delay damages. The counterclaim sought all the proximate cause damages attributable to Dornbroth's breach of contract. There was an expert report tendered two years before trial setting forth these delay damages, and somehow the trial court found that Dornbroth was prejudiced and granted a motion to eliminate that trial barring any introduction of delay damages, and we believe that was error as well. Thank you. Napoli. May it please the Court. We cannot, nor did the circuit court, look at this case and this project in a vacuum. I think to look solely upon the scope of work, which is dated as May 15, 2000, would be selling short what actually took place. This project began at some point prior to that. There was a scope of work dated January 5, 1999, which was submitted by Dornbroth for $89,850. Included in that scope of work, it specifically excludes, not included, engineers' stamp of approval. There is verbal testimony, which was provided at trial, that proved that there were discussions between the architect, Mr. Corrales, who was hired by the property owner, Dr. Schlenker, which addressed this issue of who was going to be responsible for the design of this HVAC system. If you look at the opinion of the lower court, one of the first things that's mentioned by the lower court is that Mr. Dornbroth knew from the beginning and expressed to the owner that he was not going to be responsible for the mechanical drawings. He does not have a mechanical engineer on staff. Dr. Schlenker knew this. When it came time for Mr. Dornbroth to submit his drawings, he submitted shop drawings to Mr. Corrales, the architect, Mr. Corrales, in response said, what is this to Dr. Schlenker? Dr. Schlenker said, just go ahead with the project. And the architect, Mr. Corrales, openly admitted in court under sworn testimony that he was responsible for the mechanical design of this system. He was also responsible for any code adherences. The buck certainly did stop with him. As far as this Section 6 issue is concerned, which I find it to be a novel argument and one which, unfortunately, was first brought to our attention during closing statements by our opponent, be that as it may, we have to look at the language of the statute literally. And surmising, it states that the work has to be commenced and completed with, you know, really what it's saying is that for that portion which your lien is being enforced, and what are we enforcing liens for? We're not enforcing liens to be paid for work which we've already done. We're seeking to enforce a lien for work which we've done and have not been paid for. So that's the issue that I address. The fact that the opponent says that they had already paid $550,000 in charges and, in fact, they paid almost $100,000 more for your client to correct its errors. First of all, we take issue with the fact that our client did commit any errors. The testimony which is included in the opinion of the lower court addresses that issue. Mr. Corrales, during his testimony, stated that the only error, here it is, finally, Corrales testified that the only error made by Dornbos was the incorrect placement of ductwork in one of the surgery rooms which was ultimately relocated to the designated location against the wall by Dornbos. Dornbos testified in adverse examination that this reposition in the ductwork was not charged for by Dornbos. So that one item which he took responsibility for, he did correct it. And we're talking about a large project here. Even Mr. Manley said this is not unusual in a project of this scope, that you're going to have changes in the field, there's going to be oversights, there's going to be things that are missed. But in this case, I think at the end of the day, the finger points, unfortunately, to Dr. Schlenker. He was, in fact, the architect of his own misfortune. And the reason being is that he hired an architect that was unqualified for this type of project. He also had the project commence before the IDPH even approved the plans. I mean, this is all in evidence. And Mr. Manley specifically stated that under those circumstances, the owner takes on the risk. And that's what happened there. And Dornbos knew that it did not have the background to perform up to IDPH standards. So was it not at fault for taking on the project, which it knew it had no expertise in performing? Well, no, I would not say he was at fault. Because he made it clear up front that he did not have experience with IDPH codes. And that's why they had to have the architect involved. In fact, there was testimony that Mr. Dornbos had recommended another mechanical engineer. But Dr. Schlenker, perhaps in the interest of saving a few bucks, chose not to take that route. So, no, I don't feel that my client – my client was basically the pawn in this circus, if you will. Because that's what this was. This project was poorly managed, poorly planned, and poorly executed. And not because of Dornbos, but because of Dr. Schlenker himself and his first right-hand man, Mr. Changman, which you referred to earlier. He was responsible for – he was the conduit, if you will, between the architect and Dornbos. And counsel is correct. The direction, as far as the placement of those fire dampers were concerned, came from Changman. And Changman got the command from the architect. It's interesting to note that the plans which were submitted for approval to the IDPH neglected to even indicate the placement of the fire dampers. Mr. Manley, under oath, admitted that was an oversight on our part. Mr. Corrales admitted that was an oversight on my part. In addition, the duct work, which went through the penetration, it went through the stairwell, which you referred to earlier, that was on the plan. And IDPH didn't catch it. My client had to go back in, had to correct it, and he rightfully charged for it. As far as the cost of the project is concerned, on the contract of May 15, 2000, it states that the scope of work was $493,208 as of May 1, 2000. The reason it says that is because it was already readily apparent that there was going to be more work to be involved. Dr. Schlenker knew it. He approved the additional work to bring this project into compliance with the IDPH. He ran into a problem with my client, stopped paying him. My client said, you know, if I don't get paid, I'm not going to continue to invest time and money into the project. There's even in the record where Dr. Schlenker openly admits that he owes him $80,000, but offered, why don't I make you a partial payment to keep you working? My client, by all rights, wasn't willing to accept that offer. He also felt uncomfortable about the fact that he was basically forced to sign off on that certification the next day he walked off the job because he just didn't feel right about it. And that's in the record as well as in the opinion of the lower court. As far as the issue concerning the delay damages, aside from Dornbos, there were two other third-party defendants involved. Mr. Corrales, obviously, and Mr. Changman of Team Company. Team Company defaulted. They're in default. As far as I know, there's never been a prove-up or a judgment reduced or anything like that, but they're in default. As far as Corrales is concerned, he settled out. And the court took notice, based on my argument, that the third-party complaint from Dr. Schlenker to those two defendants specifically sought damages for delay, including loss, rental income, and so on and so forth. That was not lodged against my client. My client's complaint against, the counter-complaint against my client was solely for breach of contract and made no specific reference to delay damages. So that's why I objected. I actually went in on a motion to get disclosure of the settlement terms, figuring there's a sell-off issue here. Well, that was denied. I was not given any information pertaining to the settlement with Mr. Corrales, and then Dr. Schlenker at the EVA trial submitted the trial statement, which included a claim for the delay damage. I immediately went in on a motion to eliminate, to have any evidence barred pertaining to delay damages because they didn't seek that against my client. So that's, I think the court made the right decision. It was within the discretion of the court to exclude that evidence, and rightfully did so. Okay. Thank you, counsel. Thank you. Please prove, Bob. The fact that prior iterations of the contract with Dornbos excluded engineer stamps of approval helped establish that Dornbos agreed to design and build the system in the final iterations. So if the engineer stamp of approval was excluded in prior versions of the agreement, the ultimate agreement that was, and all the prior agreements were merged into it, Dornbos said he expressly took that out, thereby agreeing to design and build the system and furnish whatever certifications would be necessary. Did you say he expressly took it out? I thought he merged the two prior documents into the final. Well, it was deleted from the ultimate, the final version. So that language that he would exclude engineer stamps of approval was deleted in the final ultimate version of the contract of May 2000, and he intentionally took that out. He testified because he was agreeing to furnish those certifications as a design builder. There's no case cited in the briefs or existing in Illinois law that says that Dr. Schlenker, the owner, somehow assumes design responsibility in this kind of case. You have a design build contractor. The actions of Dr. Schlenker did not absolve Dornbos of its contractual responsibility and liability. And that's the key. What was Dornbos' contractual responsibility? We've heard much about after the fact the buck stops here. Wasn't the testimony from Lynn Manley, who was, as I understand, a staff architect with the IDPH, didn't she say that when there is not a mechanical engineer on board on the project, then the ultimate responsibility lies with the architect, which in this instance would be Mr. Corrales? Wasn't that the testimony? I believe that Mr. Manley said that's the general rule. Was it ever contradicted, that testimony? Yes. Yes. Manley's understanding of the contract, as a general rule, the architect is responsible, but does that absolve Dornbos from contractual design responsibility and contractual? Who contradicted that testimony? I'm sorry? Who contradicted that testimony? The plaintiff's, the Dornbos' own expert at volume 2, page 117. He was shown the Dornbos' contract, and he was asked the question. And Mr. Dornbos and his firm were the design-build contractors for the HVAC system in this case, weren't they? Looks like it, yes. That's the plaintiff's own engineering expert. Mr. Corrales himself, when shown the contract, was asked the question. At volume 9, pages 96 to 97. So that would indicate to you that Dornbos was responsible for the design and build of the HVAC system, correct? That's, yeah, that's the way I read it, yes. This is the same gentleman who, where the buck stopped. This is Mr. Corrales, and looking at the contract, says that Dornbos is. Is that the same gentleman? Yes. Yes, Your Honor. Yes. So Mr. Corrales, who might have had an axe to grind two years later, after settling with Ms. Dr. Schlenker, might have tried to pull out a sword and said the buck stops here, but that doesn't render the contract void. That doesn't render Dornbos's installation liability void. And that certainly doesn't put the responsibility on Dr. Schlenker to pay for this system two and three times over and for a half a million dollars in cost of repairs. Dr. Schlenker had to pay a half a million dollars on top of the Dornbos contract to repair Dornbos's defective work. He paid for this system twice. And Dornbos is somehow saying that because the architect said the buck stops here, that absolves him from all responsibility for his design and installation. I mean, that wasn't the only basis of the judge's ruling, what Mr. Corrales said. If I recall what I read correctly, the judge made a credibility assessment too and found the appellee's witnesses more credible and didn't find, I think it's Dr. Schlenker. Schlenker, yes. Schlenker, they didn't find his account very credible. Well, and he relied on two after-the-fact memos that Schlenker wrote in 01 and 02 saying that Corrales should have had code responsibility. Well, it's a layman's interpretation and maybe there was, there could be shared responsibility here. This is not an either-or situation. In all construction cases, the architect, the general contractor, the subcontractors are defendants and there can be shared responsibility for these designers. It's not an either-or thing where the architect has sole responsibility of the contractor. There can certainly be shared responsibility for these design and contractors, which was totally ignored in this case. So for these reasons, we ask that the judgment in favor of Dornbroth on the counterclaim and against Dr. Schlenker on all other claims be reversed and judgment be entered in favor of Dr. Schlenker. Thank you very much. Thank you, counsel. Thank you both. This matter will be taken under advisement.